UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JOHNNIE M. ANGEL, | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 1:14-CV-352-CHS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
|    Defendant. | ) | |

## **MEMORANDUM**

I.    Introduction

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying Johnnie M. Angel ("Plaintiff") a period of disability and disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.

The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit (Doc. 19). Pending before the Court are Plaintiff's Motion for Judgment on the Pleadings (Doc. 12) and Defendant's Motion for Summary Judgment (Doc. 14).

For the reasons stated herein, the Court **AFFIRMS** the Commissioner's decision. Accordingly, the Court **DENIES** Plaintiff's Motion (Doc. 12) and **GRANTS** Defendant's Motion (Doc. 14).

1

II. Background

    A. Procedural History

On October 26, 2011, Plaintiff protectively filed for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, based, in part, on degenerative spondylosis of the cervical spine.[1] (Tr. 37-39, 97-102, 129).[2] Plaintiff's claim was denied initially and on reconsideration (Tr. 37-39, 42-45, 47-49). On August 15, 2013, Plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") John Proctor (Tr. 27-36). On August 30, 2013, the ALJ issued a decision finding that Plaintiff was not under a "disability" as defined in the Act because work existed in the national economy that she could still perform (Tr. 7-26). On October 30, 2014, the Appeals Council denied Plaintiff's request for review (Tr. 1-5). Thus, Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the Commissioner's final decision subject to judicial review. *See* 42 U.S.C. § 405(g).

    B. Relevant Facts

*Plaintiff's Age, Education, and Past Work Experience*

Plaintiff is currently a 48-year-old individual who has earned an associate degree and performed past relevant work as a respiratory therapist and marketing representative (Tr. 117-127). At the time of her alleged onset date of September 13, 2010, Plaintiff was 42 years old (Tr. 115).

---

[1] The Court will focus its review of the record on the impairments that are relevant to Plaintiff's Motion for Judgment on the Pleadings.

[2] An electronic copy of the administrative record is docketed at Doc. 10.

*Plaintiff's Medical History*

In February 2008, Plaintiff injured her cervical spine in a car accident (Tr. 31, 413). On March 31, 2008, a cervical spine MRI revealed "[m]ild spinal stenosis at the C5-6 and C6-7 levels secondary to tiny posterior disc protrusion" as well as "[m]inimal disc bulges at the C3-4 and C4-5 levels without evidence of significant stenosis of the spinal canal or nerve root foramen" (Tr. 210). A cervical spine MRI on March 15, 2010, revealed cervical degenerative disc disease and cervical spinal stenosis (Tr. 228). Plaintiff underwent another cervical spine MRI on June 28, 2010, which revealed multiple central disc herniations and protrusions causing cord compression at C4-5, C5-6, and C6-7 (Tr. 304-05).

On September 13, 2010, Dr. Richard Pearce performed a cervical discectomy and fusion at C5-6 without complications (Tr. 308-10). At a post-operative visit on September 28, 2010, Plaintiff reported that her symptoms were "75% improved" following surgery, but she continued to complain of pain in her spine, numbness and tingling in her right upper extremity, and pain, numbness, and tingling in her left upper extremity (Tr. 400). Upon exam, Plaintiff demonstrated "full painless range of motion" in her bilateral upper extremities and 5/5 motor findings in the C5-T1 myotomes (Tr. 401). Dr. Pearce recommended that Plaintiff remain off work until her next follow-up appointment. *Id.*

At follow-up appointments on November 30, 2010, and March 1, 2011, Plaintiff continued to report a 70% improvement in symptoms post-surgery, but also continued to complain of pain and decreased range of motion in her cervical spine as well as numbness, tingling, and weakness in her upper extremities, including radicular pain in her right upper extremity that caused difficulty sleeping (Tr. 396, 398). Physical examination at the March visit

revealed that Plaintiff was in no acute distress and had upright posture and 5/5 motor findings in the C5-T1 myotomes (Tr. 396). Dr. Pearce observed that Plaintiff's fusion appeared "solid" and opined that she had "reached maximum medical improvement" (Tr. 397). He advised her to "avoid high impact activities in the future" and instructed her to "actively pursue home exercises as tolerated." *Id.* Dr. Pearce did not schedule Plaintiff for a follow-up appointment but instructed her to follow-up as needed. *Id.*

In an unaddressed letter dated July 4, 2011, Dr. Pearce opined that, based on the cervical spine regional grid in the *Sixth Edition of the A.M.A. Guidelines of Impairment* and based on Plaintiff's clinical exam and complaints from the March 1, 2011, follow-up visit, that "her impairment is eleven percent (11%) of the whole person" (Tr. 603).

On January 17, 2012, Plaintiff returned to Dr. Pearce (Tr. 394-395). Upon examination, Dr. Pearce observed that Plaintiff was well-developed, well-nourished, and in no acute distress (Tr. 394). Plaintiff demonstrated intact motor and sensory reflexes in the bilateral upper and lower extremities, and her deep tendon reflexes were trace and symmetrical in her biceps, triceps, brachioradialis, knees, and ankles. *Id.* Her right and left radial pulses were intact, and her Hoffman's reflex was negative bilaterally. *Id.* Dr. Pearce ordered a cervical spine MRI and, upon review, concluded that the results were consistent with a "herniated nucleus pulposus . . . at C5-6 (left), medium sized and with neurologic compression" and disc bulge at C3-4, C4-5, and C6-7 without compromise of any neural structures (Tr. 395).

On January 31, 2012, Dr. Hak Seo, a Tennessee Disability Determination Services ("DDS") medical examiner, performed a consultative examination of Plaintiff (Tr. 413-416). Dr. Seo observed that Plaintiff was well-developed and well-nourished "with no gross structural

4

defects" and "full range of motion of the lumbar spine" (Tr. 415). Range of motion of the cervical spine revealed ventral motion at 25 degrees, lateral 20 degrees bilaterally, right rotation 35 degrees, and left rotation 25 degrees. *Id.* She demonstrated straight leg raises at 90 degrees bilaterally in the sitting and supine position as well as full range of motion in all joints. *Id.* She was able to make a fist with both hands but had "slight decreased grip strength." *Id.* She demonstrated intact peripheral pulses, deep tendon reflexes, and motor strength, and she had no pedal edema. *Id.* Dr. Seo identified no gross neurological defects and a Romberg's test was negative. *Id.* Plaintiff ambulated with a normal gait and was able to perform the toe walk, heel walk, tandem walk, and squat. *Id.* Dr. Seo noted that Plaintiff was able to get on and off the exam table independently. *Id.* In addition to the physical examination, Dr. Seo reviewed Plaintiff's March 2008 and August 2010 cervical spine MRIs. *Id.*

Dr. Seo opined that Plaintiff "would have difficulty with any repetitive overhead lifting or gazing" but "should retain the ability to occasionally lift and carry 20 to 25 pounds," frequently lift and carry 15 pounds, and "sit, stand, or walk for up to 6 hours of a usual day with appropriate breaks and changes of position" (Tr. 416).

At a DDS psychological evaluation on February 24, 2012, Plaintiff was asked about her daily activities and reported that she ran errands, such as going to the grocery store or to a doctor's appointment, once or twice a week (Tr. 431). She said that she was able to vacuum, mop, dust, and wash laundry but that it took "longer because of her medical issues" (*Id.*). She indicated that she was able to cook meals and mow the yard with a riding lawnmower (*Id.*). For hobbies, Plaintiff said that she enjoyed reading, watching television, and taking pictures (*Id.*).

On April 18, 2012, Dr. Marcus Whitman, a non-examining DDS consultative physician,

reviewed Plaintiff's medical records and completed a physical Residual Functional Capacity ("RFC") assessment (Tr. 451-458). Dr. Whitman opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; and push and/or pull in an unlimited capacity (Tr. 452). Dr. Whitman also opined that Plaintiff could frequently balance, stoop, kneel, and crouch; occasionally crawl and climb ramps and stairs; but never climb ladders, ropes, or scaffolds (Tr. 453). He also opined that Plaintiff had no manipulative, visual, or communicative limitations, but that she should avoid concentrated exposure to extreme cold, wetness, and humidity, and avoid all exposure to hazards (Tr. 454-455).

On May 11, 2012, Plaintiff presented to Dr. Homero Rivas, one of Dr. Pearce's partners, complaining of radiating lumbar pain, numbness, weakness, and tingling that she said had started one month prior (Tr. 575). A physical examination revealed a normal gait, and Plaintiff was able to perform the heel walk and toe walk (Tr. 576). Plaintiff demonstrated restricted extension, tenderness, and pain with lumbar rotation and bending (*Id.*). A lumbar spine x-ray showed the left hip was approximately 5mm higher than the right hip, an abnormal posterior facet at L5-S1, no evidence of spondylolisthesis or evidence of translational or angular instability on flexion and extension, degenerative disc disease at L4-5 and L5-S1, evidence of posterior facet sclerosis at L4-5 and L5-S1, anterior osteophyte formation at L2-3 and L4-5, and decreased motion (*Id.*). Dr. Rivas diagnosed degenerative disc disease of the cervical spine, low back pain, piriformis syndrome, sacroiliac joint disorder, posterior facet arthrosis at L4-5 and L5-S1, and bilateral leg pain and radiculitis (*Id.*).

A May 24, 2012, MRI of the lumbar spine showed "mild or early degenerative changes

6

of the L4-L5 disc space [with] no evidence of spinal stenosis or nerve root encroachment" (Tr. 522). On June 1, 2012, Plaintiff reported to Dr. Rivas that she had not been attending physical therapy since her May 11, 2012, doctor visit because "she wanted to wait to review the MRI results" (Tr. 567). Dr. Rivas advised her to start physical therapy and to call back if she saw no improvement (*Id*.). During Plaintiff's September 7, 2012, three-month follow-up visit with Dr. Rivas, he noted that she still had not been attending physical therapy but that she had been performing exercises recommended from a friend who was a therapist (Tr. 555). She related that the exercises "increased her symptoms" (*Id*.).

On June 19, 2012, Dr. Saul Juliao, a non-examining DDS consultative physician, reviewed Plaintiff's medical records and completed an RFC assessment (Tr. 468-476). Dr. Juliao opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; and would be limited pushing and/or pulling with her upper and lower extremities (Tr. 469). Dr. Juliao also opined that Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds (Tr. 470). He also opined that Plaintiff would be limited to occasional overhead lifting bilaterally; frequent handling and fingering bilaterally; and that she should avoid concentrated exposure to extreme cold, hazards, and vibration (Tr. 471-472).

On September 24, 2012, Plaintiff underwent a cervical spine MRI that revealed a "previous C5-6 [anterior cervical discectomy and fusion] without evidence of recurrent stenosis or postsurgical complication [and] cervical spondylosis with a left C6-C7 disc osteophyte complex resulting in moderate canal and left foraminal stenosis, encroachment upon the exiting

7

left C7 nerve root" (Tr. 520).

Plaintiff returned to Dr. Pearce on November 13, 2012, complaining of neck pain with decreased range of motion and headaches as well as pain, numbness, tingling, and weakness in her upper extremities (Tr. 541). She reported to Dr. Pearce that Dr. Rivas had given her two epidural steroid injections, the first of which resulted in significant relief, but the second of which worsened her symptoms (*Id.*). Dr. Pearce advised Plaintiff to continue taking her pain management medications and that a surgical conference would be arranged (Tr. 542). Plaintiff returned to Dr. Pearce on January 31, 2013, with similar complaints, at which point he recommended an anterior decompression and interbody fusion at C6-7, which Plaintiff underwent on February 22, 2013 (Tr. 705-707, 718-723).

At post-operative visits on March 5, and May 9, 2013, Plaintiff reported that she continued to have cervical spine pain as well as pain, numbness, tingling, and weakness in both upper extremities (Tr. 708-712). On both occasions, Plaintiff explained that symptoms were "unchanged since [her] last office visit" (*Id.*). After examining Plaintiff and reviewing imaging, Dr. Pearce directed her to return for a follow-up visit in two months, and to contact him upon any worsening of her condition (Tr. 709). Plaintiff returned on May 9, 2013, with the same complaints and again reporting that her symptoms were unchanged since her last visit (Tr. 710). On examination, Plaintiff demonstrated decreased light touch sensation at left C7 and in her index finger and thumb tips (Tr. 709, 711). At the May 9 visit, Dr. Pearce reviewed an x-ray of Plaintiff's cervical spine and observed that the "anterior fusion appear[ed] to be consolidating normally" (Tr. 712). Plaintiff returned to Dr. Pearce on August 13, 2013, with complaints of pain and decreased range of motion in her cervical spine, and pain, numbness, and weakness in

her bilateral upper extremities (Tr. 755). She reported that her symptoms were "worse since [her] last office visit" and related that she had "constant" neck pain, which she described as an "electrical sensation, throbbing and burning" (*Id.*). She related having an intermittent, "dull," radiating pain in both arms along with numbness and tingling (*Id.*).

*Hearing Testimony*

At the hearing on August 5, 2013, Plaintiff was represented by counsel. The ALJ heard testimony from Plaintiff and Curtis Taylor, a vocational expert ("VE"). (Tr. 27-36). Plaintiff testified that she earned an associate degree in respiratory therapy and had last worked as a respiratory therapist (Tr. 30). She testified that she was unable to work because of pain in her arms and back, numbness in her hands, and limited range of motion in her neck (Tr. 30-31). She acknowledged that she was in a car accident in 2008 and underwent neck fusion surgery in 2010 (Tr. 31). She explained that, before her 2010 surgery, she was "just having some migraines, and a little bit of arm pains," but that, following the surgery, she "still had the pain in [her] neck and [her] arms" (*Id.*).

Plaintiff testified that she elected to undergo a second surgery in February 2013 due to "bulging" vertebras in her spine and numbness in her left arm and hand (*Id.*). Following the second surgery, Plaintiff still experienced numbness in her hands, which caused her to often drop things and compromised her typing ability (Tr. 32). Additionally, Plaintiff testified that her inability to move her neck up, down, or side-to-side caused her to often trip and to have trouble taking the stairs and looking at a computer screen (*Id.*). To relieve her neck pain, Plaintiff stated that she took medication, sat in a recliner with her feet elevated, and had to "just sit and rest constantly" (Tr. 32-33). Plaintiff testified that, due to her upper neck pain, she developed some

9

lower back pain which, in turn, limited her ability to walk very far (Tr. 33). Plaintiff stated that, when walking, she has to "constantly stop [and] sit down because [her] lower back starts hurting and cramping" (*Id*.). She related that she was comfortable lifting five pounds (*Id*.).

*Findings of the ALJ*

After considering the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since September 13, 2010, the alleged onset date (20 CFR 404.1571, *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical and lumber spine, status-post cervical discectomy and fusion at C5-6 and migraine headaches (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could not perform repetitive overhead lifting or gazing and would be limited to simple one and two step tasks consistent with unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 12, 1968 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the

10

claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 13, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-19).

III. Analysis

A. Standard of Review

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step.

11

20 C.F.R. § 404.1520; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Sec'y, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Sec'y, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

B. <u>Discussion</u>

Plaintiff presents one issue for review: whether the ALJ erred by giving significant weight to consultative examiner Dr. Hak Seo's opinion when his opinion was rendered more than a year before, and therefore did not consider, Plaintiff's second spinal fusion surgery in

12

February 2013 (Doc. 13 at 7-9).  The Commissioner responds that the ALJ properly considered all of the medical evidence in the record when determining Plaintiff's RFC (Doc. 15 at 3).

Before step four of the sequential evaluation process, an ALJ must assess the claimant's Residual Functional Capacity ("RFC").  *See* 20 C.F.R. § 404.1520.  An RFC assessment describes the most the claimant can do after considering the effects of all impairments on the ability to perform work-related tasks.  *See* 20 C.F.R. § 404.1545; *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) (unpublished).  "It is meant 'to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from -- though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities.'"  *Stankoski*, 532 F. App'x at 619 (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002)).  Here, after considering the record, the ALJ determined that Plaintiff retained the RFC to perform a range of light exertional work (Tr. 15-18).

In determining Plaintiff's RFC, the ALJ gave "significant weight" to the opinion of Dr. Seo, who physically examined Plaintiff on January 31, 2012 (Tr. 17; 413-416).  Dr. Seo opined that Plaintiff could lift and carry 20 to 25 pounds occasionally and 15 pounds frequently; sit, stand, or walk for up to 6 hours of a usual day with appropriate breaks and changes of position; and would have difficulty with any repetitive overhead lifting or gazing (Tr. 17, 413-416).

Plaintiff contends that the ALJ's assessment of her RFC "cannot reasonably portray the reality of [her] circumstances" because Dr. Seo's opinion, to which the ALJ gave "significant weight," was "rendered more than a year prior to Plaintiff's second cervical fusion" in February 2013 (Doc. No. 13, at 8).  Plaintiff points out that her second spinal surgery is "integral" to her disability claim because it shows that her condition did not improve after her initial surgery.  *Id.*

13

The Sixth Circuit has held that an ALJ does not err by relying on a state agency opinion that was provided early in the administrative process and thus does not account for later changes in the claimant's condition so long as the ALJ's decision demonstrates consideration of those later changes. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (finding no error when it was "clear from the ALJ's decision . . . that he considered" the relevant medical evidence); *see also* Report and Recommendation entered and adopted by the court in *Luggen v. Colvin*, 2015 WL 5707211, at *10 (E.D. Ky. Aug. 28, 2015) (finding no error when ALJ's decision demonstrated "that she considered the few records that were unavailable" to the state agency physician). This rule follows the logic that there is necessarily a time lapse between the time a state agency physician renders an opinion and the time the ALJ renders a decision and that "even if the state agency physician did not review the complete medical record, the ALJ did and could properly consider it in context." *McIntosh v. Colvin*, 2014 WL 4109755, at *7 (E.D. Ky. Aug. 19, 2014); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d. Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision.").

In this case, the ALJ plainly reviewed the evidence that Plaintiff contends was unavailable to Dr. Seo. The ALJ noted Plaintiff's September 2012 cervical spine MRI showing "cervical spondylosis with a left C6-7 disc osteophyte complex resulting in moderate canal and left foraminal stenosis encroachment upon the exiting left C7 nerve root" (Tr. 17). The ALJ also noted that, in January 2013, Plaintiff complained of neck pain, decreased range of motion, and headaches and that Dr. Pearce recommended fusion surgery, which Plaintiff underwent in February 2013. *Id.* The ALJ observed that Plaintiff reported no change in her symptoms post-

operatively and that Dr. Pearce's review of imaging showed that "the anterior fusion appeared to be consolidating normally" (Tr. 17).[3]

It is the role of the ALJ, not a physician, to ultimately determine a claimant's RFC from the record. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 719, 728 (6th Cir. 2013) (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010)). Thus, although Dr. Seo was unable to review the records from Plaintiff's subsequent treatment in 2012 and 2013, the ALJ could and did.[4] The ALJ nevertheless found that Plaintiff's pain had been largely controlled by treatment and that, although she did have limitations related to her neck, those limitations were not totally disabling. Moreover, the ALJ did not rely solely on Dr. Seo's opinion but also considered the opinions of non-examining state agency consultants, Dr. Whitman and Dr. Juliao (Tr. 17-18).[5] The ALJ also considered Plaintiff's own reports that she ran errands once or twice

---

[3] The Court notes that, although Plaintiff did report post-operatively that her symptoms were unchanged as of March 5, and May 9, 2013 (Tr. 708-712), she also reported that her symptoms had worsened as of August 13, 2013 (Tr. 755). Thus, the Court finds that it was error for the ALJ to state that Plaintiff had "reported no change in her symptoms" post-operatively (Tr. 17). However, the Court finds the error to be harmless. Although Plaintiff may have reported subjective worsening of symptoms, the review of systems and exam findings pertaining to Plaintiff were substantially unchanged and Dr. Pearce found that her fusion was consolidating normally (Tr. 709, 712, 756). Moreover, her diagnosis and treatment plan between these post-operative visits remained unchanged, and Dr. Pearce never found her to have any greater restrictions or functional limitations following her second surgery (*Id.*). Given this record, the Court cannot say that the ALJ's error prejudiced Plaintiff. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654-55 (6th Cir. 2009) (noting that harmless error analysis applies to administrative agency findings and that remand is not appropriate "unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal citations omitted).

[4] Plaintiff also points out that the ALJ did not mention her February 2013 C6-7 fusion surgery when identifying her severe impairments at step two (Doc. 13 at 9). However, if an ALJ fails to address a certain impairment at step two, "the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the [plaintiff's] impairments in determining her residual functional capacity." *Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. July 13, 2006) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). As discussed above, the ALJ appropriately considered Plaintiff's February 2013 fusion surgery when determining her RFC. Accordingly, the Court concludes that it was harmless error for the ALJ not to address the surgery at step two.

[5] The ALJ ultimately gave more weight to Dr. Seo's opinion after finding it "more consistent with the record" (Tr. 18).

15

a week, performed household chores such as cooking, vacuuming, mopping, dusting, washing laundry, and mowing the lawn using a riding lawnmower (Tr. 18). The ALJ found that these and other reported activities were inconsistent with a finding of disability. The ALJ's decision demonstrates that he appropriately considered the entire record in determining Plaintiff's RFC and did not err in placing significant weight in Dr. Seo's opinion.

IV. Conclusion

Having carefully reviewed the entire administrative record and the parties' briefs filed in support of their respective motions, the Court concludes that there is substantial evidence in the record to support the ALJ's findings and the Commissioner's decision, and that neither reversal nor remand is warranted on these facts. Accordingly, Plaintiff's Motion for Judgment on the Pleadings (Doc. 12) is **DENIED**; Defendant's Motion for Summary Judgment (Doc. 14) is **GRANTED**; the case is **DISMISSED**; and the Court directs the Clerk to **CLOSE** the case.

s\ *Christopher H. Steger*
CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE